FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

99 AUG 19 PM 3: 32

U.S. DISTRICT COURT
N.D. OF ALABAMA

CAROLYN DIANE STEELE,                )
                                     )
        Plaintiff,                   )
                                     )
vs.                                  )    Civil Action No. 98-S-0868-NE
                                     )
ALABAMA A&M UNIVERSITY,              )
                                     )    ENTERED
        Defendant.                   )
                                          AUG 19 1999

## MEMORANDUM OPINION

Carolyn Diane Steele is a former employee of Alabama A&M
University.  She alleges two violations of Title VII of the Civil
Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*:  (1)
gender-based wage discrimination; and (2) retaliation.  The action
now is before the court on defendant's motion for summary
judgment.[1]

### I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides
that summary judgment "shall be rendered forthwith if the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  "An issue of fact is

---

[1] Plaintiff originally alleged violations of the Equal Pay Act, 29 U.S.C.
206(d), and named as individual defendants John T. Gibson, P.N. Lanier, and Oscar
Montgomery.  See Complaint, Document No. 1.  The claim and each defendant were
dismissed by order entered August 28, 1998. (Document No. 11.)



'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Id.* In determining whether this burden is met, the court must view the evidence "and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, "the burden shifts to the nonmovant to 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In meeting its burden, "the nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993,

2

994, 8 L.Ed.2d 176 (1962)).

"'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tipton*, 965 F.2d at 999 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513). Even so, a "mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242, 106 S.Ct. 2505). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

With those standards in mind, the court now proceeds to summarize the undisputed facts or, if disputed, to frame them in a light most favorable to plaintiff.

## II. STATEMENT OF FACTS

Carolyn Diane Steele began her employment with Alabama A&M University ("the University"), in March of 1987, when she was hired as data analyst in the school's Financial Aid Office.[2] Her initial salary was $13,560.[3] As data analyst, Steele's duties included:

> 1.0 Meet with Parents, Students, Counselors and others within and outside of the office to discuss and

---

[2] Lois Thompson Affidavit at ¶ 4.

[3] *Id.*

3

> assist the above in understanding how to complete financial aid material.

2.0 Assist with the preparation of financial aid material for dissemination to students, parents, counselors, and others (e.i. [sic] aid applications, Financial Aid brochures, Guaranteed Student Loan Packets and etc.)

3.0 Assist the Date Analyst/Specialist with the processing of aid material when not otherwise detained.

4.0 Assist the Data Entry clerk in resolving award entry problems due to the failure of the student to respond to inquiries for additional information.

5.0 Discuss with interested individuals sources of aid available from the University, private aid sources, the state and the Federal Government.

6.0 Carry out other assignments which the Director and/or the Assistant Director may find necessary to assign.

(Montgomery Deposition, Plaintiff's Exhibit 4.)

The United States Department of Education provides grant funding to universities such as Alabama A&M through the Strengthening Historically Black Colleges and Universities Program under Title III of the Higher Education Act of 1965, as amended by Public Law 96-374.[4] The grants cover funding for a five year period.[5] In 1987, Title III Coordinator Dr. John Vickers, Jr. authored the grant application for funding the Improvement of Student Services program.[6] The grant application originally

---

[4] Vickers Affidavit at ¶ 3.

[5] Vickers Deposition at 15.

[6] According to Dr. Vickers, the purpose of the Title III department is: "[t]o administer the Title III funds received form the U.S. Department of Education and prepare proposals for the U.S. Department of Education and all the reports required." Vickers Deposition at 11. He explained further that after the Title III budget receives approval from the U.S. Department of Education, the University receives a lump sum of money covering the entire Title III budget.

4

provided for one personal-social counselor and one financial aid counselor. The grant application included the proposed salary for each position.[7] Funding for the financial aid counselor position, however, was not provided in the budget until the 1988-89 academic year.

During the Spring of 1988, the University began instituting a salary schedule for its staff employees that had been designed by an outside consultant.[8] Pursuant to the schedule, all staff positions were classified as a particular grade. Each employee then was placed on a "step" within the grade based on their length of employment, regardless of sex, race or any other such factor.[9]

The personal-social counselor position was classified as grade XV. In February of 1988, Jimmy Downing was transferred into this position.[10] Downing had been employed by the University since 1981;

---

It is then the Title III department's responsibility to disburse the appropriate funds to the specific Title III programs. If funds are not fully used for the requested purpose, as Title III Coordinator, Dr. Vickers has four options: 1) carry the funds forward for a period of ten years until the funds are used for their intended purpose; 2) request permission from the U.S. Department of Education to reallocate the funds for another purpose; 3) the Title III Coordinator may reallocate 10% of the total funds internally to another line item within the budget; and 4) remaining funds for a specific line item may be spent for the same purpose without requesting permission from the U.S. Department of Education. *Id.* at 18-20.

[7] Vickers Affidavit at ¶ 3. The estimated annual salary for the personal-social counselor was $22,000 and for the financial aid counselor was $23,000. *Id.* Dr. Vickers described the budgeted salaries as a "best estimate of what it cost the University to fund these programs." Vickers Deposition at 29.

[8] Thompson Affidavit at ¶ 6.

[9] *Id.*

[10] Downing's duties as personal-social counselor included:

1) assisting with the planning, development, and implementation of

5

therefore, based on his length of employment, he was classified as grade XV, step 5, with an initial salary of $25,440. In January of 1989, however, the University determined that the step calculated for Downing was incorrect and he should have been placed at a step 9, thereby increasing his salary to $27,040.[11]

In October of 1988, Financial Aid Director P.N. Lanier informed Steele about the newly created Title III financial aid counselor position.[12] She applied for and was offered the position.

---

counseling, crisis intervention, and study skills programs; 2)working closely with all dormitory directors, other Student Affairs and academic personnel to insure effectiveness of the total counseling program; 3) serving as immediate supervisor of graduate students and peer counselors; 4) conducting individual and group counseling sessions; 5) maintaining accurate student records; 6) conducting workshops for students and peer counselors; and in addition, included the coordination of all services provided by the University under its veterans' affairs program.

(Thompson Affidavit at ¶ 8.)

[11] Thompson Affidavit at ¶ 7.

[12] Plaintiff's Deposition at 19.  The Personnel Office Announcement regarding the Financial Aid Counselor described the duties and responsibilities as follows:

7.0   Carolyn Steele - Financial Aid Counselor

    7.1   Provides counseling and interpretation of financial aid programs and application procedures for prospective students and their parents as well as high school counselors and other persons who may have an interest in securing financial aid and/or financial aid information.

    7.2   Counsels students regarding award distribution procedures and assist students with status reports.

    7.3   Performs needed analysis and verification of data utilizing the U.S. Department of Education's verification and quality control procedures.

    7.4   Assist in collecting data and documenting files.

    7.5   Promote Financial Aid awareness/availability through

6

According to Steele, Mr. Lanier originally indicated the position would pay $23,000 per year but, after plaintiff interviewed with Dr. Earlie Rich, Vice President of Student Affairs, she learned the salary would be adjusted in accordance with the University's salary schedule.[13] This position had been classified as grade XIII and, based on Steele's length of employment (approximately one and a half years), she was placed at step 1. Her initial salary as

---

verbal and written procedures.

7.6   Travel with the University's recruitment team to High School Day activities to discuss financial aid programs.

7.7   Meet with students in the office and at selected sites on campus for the purpose of making our Financial Aid programs known.

7.8   Collects and delivers data to these areas for the purpose of paying awards or providing financial aid awareness.

7.9   Have a familiarity with all the programs of Student Financial Aid administered through this office.

7.10  Be familiar with who handles which program of Student Financial Aid so that instant reference or referral can be made to assist a student in securing aid or assistance.

7.11  Be familiar with the University's admissions requirements and standards of academic progress to counsel students.

7.12  Must be familiar with federal, state and institutional rules and regulations regarding student aid.

7.13  Performs other duties as assigned by the Director in order to meet the Goals and Objectives of the University.

(Montgomery Deposition, Plaintiff's Exhibit 4.)

[13] Plaintiff's Depositions at 19-22.

7

financial aid counselor, therefore, was $19,687.[14]   Steele accepted
the position, despite the salary change, because she still received
an increase in pay.[15]   As financial aid counselor, Steele continued
to be assigned to the Financial Aid Office and was supervised by
Mr. Lanier.[16]

In November of 1990, all University employees received a three
percent salary adjustment.   At the time, Steele was classified as
grade XIII, step 2.   Accordingly, her yearly salary increased to
$20,278.[17]   Between November, 1990, and October, 1993, the State of
Alabama reduced the level of its funding to the University, through
a process known as "proration."   As a result, none of the Title III
funded positions received salary increases.   In October 1993,
however, both Steele and Jimmy Downing received a ten percent
increase.[18]   Both also received a nine percent increase the
following year.[19]   Downing terminated his employment with the
University in January of 1996.   In 1991, Dr. Vickers added a
second personal-social counselor to the Title III budget.[20]   Sanoyia
Williams was selected to fill this position.   She was classified as

---

[14] Thompson Affidavit at ¶ 9.

[15] Plaintiff's Deposition at 22.

[16] Montgomery Deposition at 12.

[17] Thompson Affidavit at ¶ 10.

[18] Id. at ¶ 12.   Steele's salary increased to $21,095 and Downing's
increased to $28,973.

[19] Id. at ¶ 12.

[20] Id. at ¶ 11; Vickers Affidavit at ¶ 9.

8

grade XV, step 1, with a starting salary of $22,644.[21]  In 1993,
Williams became responsible for the University's Access to Learning
Program.   She received a $5,000 annual salary increase as
compensation for these added responsibilities.[22]

During 1993, the University conducted a verification procedure
to ensure that all employees were correctly classified under the
salary schedule.   Verification forms were distributed to each
employee, allowing the employee to indicate whether or not they
felt their classification was correct.   Steele indicated both her
grade and step classifications were accurate.[23]

The data analyst position Steele vacated was filled by Kentray
Sims.  This position had been classified at grade XI and Sims was
placed on step 1; therefore, his salary was calculated to be
$14,040.[24]   Dr. Rich, with the approval of Dr. Vickers, determined
Sims would perform additional duties under the Title III program as
a part-time financial aid counselor.  For assuming these additional
duties, Sims would receive $3,076 per year from excess Title III
funds.  Dr. Vickers explained that approval was not required from
the United States Department of Education, because the funds were

---

[21] Id.

[22] Montgomery Affidavit at ¶ 6.

[23] Thompson Affidavit at ¶ 10, Exhibits a, b.  At the time of the
verification, Steele was classified grade XIII, step 3.

[24] Thompson Affidavit at ¶ 14; Vickers Affidavit at ¶ 8.

9

going in the same direction, *i.e.*, financial aid.[25] Sims' total

yearly salary, therefore, was \$17,116.[26] In October of 1990, Sims'

title was changed to Financial Aid Analyst/Counselor; however, his

salary did not change. Sims resigned from his position with the

University in March of 1995. At the time of his departure, his

yearly salary was \$19,063.

Steele contends Sims did no work for the Title III program,

and a portion of her proposed salary was improperly diverted to

increase his salary above the amount she previously made.[27]

According to Dr. Vickers, he explained to Steele that the Title III

budget contained estimated salary amounts, but that the

University's Department of Human Resources determined the actual

salary paid.[28]

Beginning in 1992, Steele met with various University

officials, including Mr. Lanier, Dr. Vickers, and Dr. Montgomery,

to discuss what she believed to be a misappropriation of her

salary.[29] Steele characterized these discussions as an attempt to

"rectify the situation," but admitted she never specifically told

---

[25] Vickers Deposition at 44; Montgomery Deposition at 23. *See also* note 6 supra, for a discussion of the University's options regarding excess Title III funding.

[26] Thompson Affidavit at ¶ 14.

[27] Plaintiff's Deposition at 26.

[28] Vickers Affidavit at ¶ 11.

[29] Plaintiff's Deposition at 41.

10

anyone she believed she was being discriminated against because of her gender.[30]    Steele nevertheless believes gender discrimination was implied during the conversations since the discussions involved a male (Sims) receiving a portion of her salary.[31]

Steele admits the personal-social counselors were a different type counselor under the Title III program, and does not contend her salary should have equaled that of Downing or Williams.[32] Steele does contend, however, that Downing received larger increases in his salary.[33]    According to Steele, Dr. Montgomery explained to her that Downing received a higher salary because he was tenured by the University.[34]    Steele admits she was never told that she was paid differently because of her gender.[35]    Steele also admits she never complained of the salary differences between herself and Downing.[36]

According to Dr. Montgomery, personnel difficulties within the Financial Aid Office began during 1995, due in part to Steele.[37] Mr. Lanier testified as to his problems with Steele:

Q.    And did you have any complaints about her work?

---

[30] Plaintiff's Deposition at 68-70.

[31] *Id.* at 84.

[32] *Id.* at 42, 44, 49.

[33] *Id.* at 55-56.

[34] *Id.* at 88.

[35] *Id.* at 57.

[36] *Id.* at 63.

[37] Montgomery Affidavit at ¶ 7.

11

A. About her work, no.

Q. Did you ever institute any form of disciplinary proceedings against Ms. Steele while she was under your supervision?

A. As I define "disciplinary," no.

Q. Did you ever express a desire to any management at Alabama A&M that you thought the she should be terminated?

A. Yes and no.

Q. Okay. If you could, elaborate on that.

A. I hope you will. Do you want me to?

Q. Yes.

A. You don't have another question that you're going to ask me?

Q. No. Well, what do you mean by "yes and no"?

A. Yes and no? No, I had no reason to want Ms. Steele terminated on the basis of her job performance. I did have reason to recommend that all of the Title III counselors be put together.

Q. And how does that relate to her termination?

A. Well —

Q. If at all?

A. Okay, yeah. As I remember all of this, a decision had been made to move her to an area where all of the Title III positions were to be located, so that she would be there with the director and the other two people, carrying out the specific duties of the project.

12

And when I said, "yes and no," I thought Ms. Steele had agreed. She had met with the project director and I thought she had agreed to do this, you know, in the discussion where we told her what the project director had agreed to do, which was to accept my recommendation that she be placed with the project.

She said, "Yes, no problem," but she came back with a letter. And the letter had a set of demands, stipulation, requests — I don't want to say, "demands," a set of things that she wanted.

And I think the decision had been made, "Well, we can't meet these demands." And I considered that to be insubordination in a discussion that I had once the letter came back. So, when I say, "yes and no," no. Directly to get rid of her, no.

What do you do when a person turns down a request made by upper level management? You know, that's insubordination.

(Lanier Deposition at 66-69.)

The day before Steele was terminated, she met with Dr. Vickers. Steele contends Dr. Vickers represented to her that the salary issues were resolved and she would be receiving retroactive pay, as well as a salary adjustment.[38]

Steele received her notice of termination on September 26, 1996, by way of a hand-delivered letter from John Thomas Gibson, President of Alabama A&M University:

---

[38] Plaintiff's Deposition at 66.

13

Dear Ms. Steele:

This correspondence serves as notice to you that I am approving the recommendation of Mr. P.N. Lanier, Director of Financial Aid, and the concurrence of Dr. Oscar Montgomery, Vice President of Student Affairs, that your employment with the University be <u>terminated without cause</u>, effective October 17, 1996.

Please direct any questions you have regarding Human Resources issues to the Director of Human Resources.

I wish you every success in your future endeavors.

(Vickers Deposition, Plaintiff's Exhibit 3 (emphasis supplied).)

Gibson testified that Steele was an "at will" employee,[39] and the University therefore did not need reasons for her termination. According to Gibson, the University's contract with an "at will" employee is twelve months in length. At the end of twelve months the University may choose whether or not to reemploy the individual.[40]  Dr. Montgomery testified to the reasons for plaintiff's termination:

    Q.    What was the reason for M[s]. Steele's termination?

    A.    Well, as best I recall we did not renew her at will because of the decision of the method of doing. If I understand your question, there were continuing complaints coming to my office from Mr. Lanier concerning her being a disruption in the office.

    Q.    At whose recommendation was it to terminate Ms. Steele? Was that Mr. Lanier?

---

[39] It is well settled that "a contract of employment at will may be terminated by either party with or without cause or justification." *Bell v. South Central Bell*, 564 So.2d 46, 48 (Ala. 1990).

[40] Gibson Deposition at 7, 12.

14

A.    Mr. Lanier.

Q.    And in what way was Ms. Steele being disruptive?

A.    In terms of the chaos and the confusion and the constant thing going on in the office, antagonism with the other workers and unwillingness to execute assignments that were being given her.

(Montgomery Deposition at 35.)

Plaintiff filed her original charge of discrimination with the EEOC on April 11, 1997, and a second charge on June 12, 1997, alleging gender discrimination and retaliation by the University beginning January 1, 1988, and continuing until October 17, 1996.[41] She filed suit based on these charges on April 9, 1998.[42]

### III. DISCUSSION

**A.    Timely filing of an EEOC charge**

42 U.S.C. § 2000e-5(e)(1) requires that:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place, and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter ...

In *Zipes v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982), the Supreme Court held that "[f]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a

---

[41] Defendant's Exhibit 5.

[42] *See* Complaint, Document No. 1.

15

requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling." "Equitable tolling should not, however, be liberally construed, rather, only under certain circumstances should the doctrine be applied." *Freeman v. CSX Transportation Co., Inc.*, 730 F. Supp. 1084 (M.D. Ala. 1989) (citing *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S.Ct. 2486, 2497, 65 L.Ed.2d 532 (1980)).

Plaintiff contends that the University discriminated against her in the payment of her salary from the time she was promoted to Financial Aid counselor in October of 1988, until the time she left the University's employ in October of 1996. Plaintiff was aware of the salary disparity at the time she was promoted, but she did not file a charge with the EEOC until April 11, 1997. Plaintiff explains that she did not file the charge until after her termination was effective on October 17, 1996, because she was assured on several occasions that the pay inequity would be cured. Plaintiff contends the actions of the University constitute a continuing violation for purposes of tolling the statutory time limit for filing a charge with the EEOC. This court, however, will treat plaintiff's argument as one for equitable tolling.

The Eleventh Circuit has established that the limitations period is tolled "until the facts which would support a cause of action are apparent or should be apparent to a person with a

16

reasonably prudent regard for [her] rights." *Cocke v. Merrill Lynch & Company, Inc.*, 817 F.2d 1559 (11th Cir. 1987). The Eleventh Circuit addressed the issue of equitable tolling in *Miranda v. B&B Cash Grocery*, 975 F.2d 1518 (11th Cir. 1992), which is factually similar to the present suit. In *Miranda*, the plaintiff repeatedly discussed the difference in her salary compared to her male counterparts and was repeatedly led to believe by her employer that her salary would be corrected. Plaintiff did not file a charge of discrimination with the EEOC based on these representations. The Eleventh Circuit equitably tolled the limitations period until plaintiff was notified that she was terminated.

The same rationale applies in favor of equitably tolling the limitations period in the present suit. Beginning in 1992, plaintiff contacted Mr. Lanier to discuss what she perceived to be a misappropriation of her budgeted salary to Mr. Sims. She also met with Dr. Montgomery and Dr. Vickers. Plaintiff was in continuous discussions with different University officials in an attempt to "rectify" her salary problems. The meetings with plaintiff occurred between 1992 and the date of her notice of termination in September, 1996. Dr. Montgomery and Dr. Vickers repeatedly assured her that the University was working to resolve her salary problems. Equitable tolling, therefore, is appropriate,

17

because plaintiff was led by the University to believe her salary would be adjusted. Accordingly, the limitations period for filing a charge with the EEOC was tolled until September 26, 1996, the date plaintiff was notified of her termination.

It is well established that the 180 day limitations period begins to run from the date the employee receives notice of termination. *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981); *Cocke v. Merrill Lynch & Company, Inc.*, 817 F.2d 1559 (11th Cir. 1987); *Calhoun v. Federal National Mortgage Association*, 823 F.2d 451 (11th Cir. 1987); *Hargett v. Valley Federal Savings Bank*, 60 F.3d 754 (11th Cir. 1995). The Supreme Court held in *Delaware State College v. Ricks*, that, "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Ricks*, 449 U.S. at 258, 101 S.Ct. at 504 (quoting *Abramson v. University of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979)). As stated previously, plaintiff's limitations period began to run September 26, 1996, the date she received notice of her termination from Dr. Gibson, rather than October 17, 1996, the date her termination became effective. She therefore had 180 days from September 26, within which to file a charge of discrimination

18

with the EEOC. She did not do so. Instead, she filed within 180 days of October 17. Plaintiff filed her charge of discrimination with the EEOC on April 11, 1997: 197 days after receiving her notice of termination. Her claim of wage discrimination, therefore, was untimely filed. Defendant's motion for summary judgment is due to be granted as to plaintiff's claims of wage discrimination.

## B. Proof of Defendant's Intention to Discriminate

Even if plaintiff were found to have satisfied the administrative prerequisites for maintaining an action in federal court, she still fails to state a cognizable claim for wage discrimination upon which relief can be granted.

To prevail on a Title VII disparate treatment claim, plaintiff must prove her employer intended to discriminate on the basis of one of the impermissible factors identified by Congress: *i.e.*, "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Initially, the plaintiff must establish that gender was a determining factor with direct evidence,[43] circumstantial evidence, or statistical evidence. *E.g.*, *Alphin v. Sears, Roebuck & Company*, 940 F.2d 1497, 1500 (11th

---

[43] "Only the most blatant remarks, whose intent could only be to discriminate on the basis of [gender] constitute direct evidence." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1226 (11th Cir. 1992).

19

Cir. 1991). Plaintiff presents no direct evidence of discrimination, nor does she present any statistical evidence. The court, therefore, will proceed with the analysis for circumstantial evidence.

The Eleventh Circuit held in *Miranda v. B&B Cash Grocery*, 975 F.2d 1518 (11th Cir. 1992) that, "the *McDonnell Douglas/Burdine* approach to disparate treatment is the appropriate framework for evaluating ... [claims] of gender-based wage discrimination." That now familiar analytical framework has three steps which do not require elaboration here. The goal of the three-step process is that of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Hicks*, 509 U.S. at 506, 113 S.Ct. at 2746 (*quoting Burdine*, 450 U.S. at 255 n.8, 101 S.Ct. at 1094 n.8).

### 1. Plaintiff's prima facie case

The Eleventh Circuit in *Miranda* set forth the requirements for a prima facie case of gender-based wage discrimination: "[t]he plaintiff establishes a prima facie case of sex discrimination under Title VII by demonstrating that she is female and that the job she occupied was similar to higher paying jobs occupied by males." *Miranda*, 975 F.2d at 1529. Plaintiff fails to establish a prima facie case.

Plaintiff admits the financial aid counselor position was a

20

different counselor than the personal-social counselors. She
acknowledges that her salary should not have equaled that of the
other Title III counselors. Plaintiff also admits she never
complained of the salary differences between herself and Downing.

Plaintiff's main contention is that a portion of her salary
was diverted to Mr. Sims. Plaintiff argues she should have
received the entire budgeted salary instead of the salary in
accordance with the University's salary schedule. She contends
this salary diversion was wage discrimination.

Plaintiff's arguments fail. As an initial matter, plaintiff
admits her duties as financial aid counselor differed from her
previous position as data analyst. Moreover, Mr. Lanier testified
that Mr. Sims moved into plaintiff's previous salary, but took on
completely different responsibilities.[44] According to Mr. Lanier,
Sims "was a trained interpreter of regulations; NCAA, institutional
scholarship, private scholarship rules and regulations, etc."[45] Mr.
Sims also testified he was responsible for coordinating
scholarships with federal and state aid sources to avoid students
having an over award or violating any NCAA rules or federal or
state rules.[46] These duties differed from plaintiff's previous

---

[44] Lanier Deposition at 96.

[45] Id. at 32.

[46] Sims Deposition at 20.

duties as data analyst. Sims also performed Title III duties as a part-time financial aid counselor. Therefore, a portion of his salary was due to be paid from Title III funds. Moreover, Sims at no time made more money than plaintiff. He made more than she did as data analyst, but he was given different responsibilities. Plaintiff, therefore, has failed to demonstrate that she occupied a job similar to a higher paying position occupied by a male.

### 2. Defendant's legitimate, nondiscriminatory reasons

Although plaintiff failed to make a prima facie showing, defendant nevertheless offers legitimate, nondiscriminatory reasons for its compensation decisions. First, the University offered evidence that a legitimate salary schedule was in place, and that the Human Resource Department establishes an employee's salary regardless of the budget. Dr. Montgomery explained to plaintiff that Downing was paid more, because he was a tenured employee with the University. The University also presented evidence demonstrating the differences in the positions and the reasons for the pay differentials between plaintiff and the personal-social counselors and Mr. Sims.

### 3. Plaintiff's showing of pretext

Because defendant proffered legitimate nondiscriminatory reasons for the pay differences discussed above, even when plaintiff failed to establish a prima facie case, the burden of

22

persuasion now shifts back to plaintiff. At this third stage of analysis, plaintiff must come forward with evidence sufficient to demonstrate that defendant's stated reasons were not the real reasons for the pay differences. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied sub nom. Combs v. Meadowcraft Co.*, __ U.S. __, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *see also Hicks*, 509 U.S. at 507-08, 113 S.Ct. 2747-48.

A plaintiff, however, cannot establish pretext by merely disagreeing with, or questioning an employer's stated reasons for an adverse employment action. "Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where, as here, the reason is one that might motivate a reasonable employer." *Combs*, 106 F.3d at 1543.

The Eleventh Circuit also said, in *Elrod v. Sears, Roebuck and Company*, 939 F.2d 1466, 1471 (11th Cir. 1991), that "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, nondiscriminatory reasons for its action." (quoting *Carter v. Miami*, 870 F.2d 578, 585 (11th Cir. 1989)).

Plaintiff's showing of pretext in this case begins and ends

23

with such conclusory allegations.  Plaintiff points to no evidence

of pretext, only her conclusory allegations that males in the

financial aid office "had" to make more than the females.

Plaintiff also makes the conclusory allegation that the differences

in the reasons given for plaintiff's termination present a question

of fact sufficient to withstand summary.  "The identification of

inconsistencies in an employer's testimony can be evidence of

pretext."  *Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th

Cir. 1998) (citing *Bechtel Construction Co. v. Secretary of Labor*,

50 F.3d 926 (11th Cir. 1995); *Howard v. BP Oil Co., Inc.*, 32 F.3d

520, 525 (11th Cir. 1994)).  That may be so, but the evidence

presented by plaintiff in this case does not present such a

situation.  It is undisputed the University established salary

based upon its salary schedule.  Plaintiff signed a verification

form indicating she believed her grade and scale were correct.

Furthermore, as plaintiff points out repeatedly in brief, she never

discussed with University officials her belief that she was being

discriminated against because of her gender.  In fact, plaintiff

admits she never mentioned gender during any of the meetings

between 1992 and 1996.  This evidence weighs against plaintiff's

showing of pretext.  Plaintiff failed to produce any evidence,

other than conclusory assertions and personal assumptions, that

gender motivated any of defendant's employment decisions.  As such,

24

plaintiff has failed to cast doubt upon defendant's proffered legitimate nondiscriminatory explanations for its employment decisions. Accordingly, defendant's motion for summary judgment with regard to plaintiff's wage discrimination claim is due to be granted.

**D.    Retaliation Under Title VII**

Section 704(a) of Title VII provides protection to those who oppose or participate in uncovering an employer's discriminatory practices. That provision provides, in pertinent part, that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he [the employee] has opposed any practice made an unlawful employment practice by this [title], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title].

Section 704(a), now codified at 42 U.S.C. § 2000e-3(a), thus recognizes two bases for a claim of retaliation:    one for opposition to prohibited practices, and one for participation in protected activity. Plaintiff's claim in this case arises under the opposition clause:  i.e., because plaintiff opposed the differences in her salary. Plaintiff presents no direct evidence of retaliation.    As a result, the familiar *McDonnell Douglas* framework will be utilized in analyzing plaintiff's circumstantial evidence of retaliation.

To establish a prima facie case of retaliation for conduct

25

falling under the opposition clause of 42 U.S.C. § 2000e-3(a), a
plaintiff must show (1) that she engaged in statutorily protected
expression or activity, (2) she suffered an adverse employment
action, and (3) the adverse action was causally related to the
protected expression or activity. *See, e.g., Wideman v. Wal-Mart
Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Meeks v.
Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir.
1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.
1993).

It is well established that an employee need not prove the
underlying claim of discrimination in order to establish a
retaliation claim. *See Taylor v. Runyon*, 175 F.3d 861 (11th Cir.
1999); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491,
1494 (11th Cir. 1989). Instead, when a retaliation claim is based
upon conduct falling under the opposition clause of 42 U.S.C. §
2000e-3(a), the plaintiff must demonstrate a good faith, reasonable
basis for believing that the underlying, allegedly discriminatory
practices which she opposed constituted a violation of Title VII,
as distinguished from proving that the employer actually engaged in
an unlawful employment practice. *See, e.g., Wu v. Thomas*, 863 F.2d
1543, 1549 (11th Cir. 1989) ("[P]laintiff need only have had a
'reasonable belief' that an unlawful employment practice was

26

occurring."). This additional element of a prima facie case for a
retaliation claim under the opposition clause has two components,
as the Eleventh Circuit observed in *Little v. United Technologies*,
103 F.3d 956 (11th Cir. 1997):

> We previously have recognized that a plaintiff can
> establish a prima facie case of retaliation under the
> opposition clause of Title VII if he had a good faith,
> reasonable belief that the employer was engaged in
> unlawful employment practices. *See Rollins v. State of
> Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th
> Cir. 1989). <u>It is critical to emphasize that a
> plaintiff's burden under this standard has both a
> subjective and an objective component</u>. A plaintiff must
> not only show that he <u>subjectively</u> (that is, in good
> faith) believed that his employer was engaged in unlawful
> employment practices, but also that his belief was
> <u>objectively reasonable</u> in light of the facts and records
> presented. It thus is not enough for a plaintiff to
> allege that his belief in this regard was honest and bona
> fide; the allegations and record must also indicate that
> the belief, though perhaps mistaken, was objectively
> reasonable.
>
> A plaintiff, therefore, need not prove the
> underlying discriminatory conduct that he opposed was
> actually unlawful in order to establish a prima facie
> case and overcome a motion for summary judgment; such a
> requirement "[w]ould not only chill the legitimate
> assertion of employee rights under Title VII but would
> tend to force employees to file formal charges rather
> than seek conciliation of informal adjustment of
> grievances." *Sias v. City Demonstration Agency*, 588 F.2d
> 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's
> Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir.
> Unit A Sept. 1981) ("To effectuate the policies of Title
> VII and to avoid the chilling effect that would otherwise
> arise, we are compelled to conclude that a plaintiff can
> establish a prima facie case of retaliatory discharge
> under the opposition clause of [Title VII] if he shows
> that he had a reasonable belief that the employer was
> engaged in unlawful employment practices."), *cert.*

27

denied, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982).

Little v. United Technologies, 103 F.3d at 960 (emphasis in original) (footnote omitted); see also, e.g., Meeks v. Computer Associates International, 15 F.3d 1013, 1021 (11th Cir. 1994); EEOC v. White & Sons Enterprises, 881 F.2d 1006, 1012 n.5 (11th Cir. 1989); Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989); Silver v. KCA, Inc., 586 F.2d 138 (9th Cir. 1978); I Barbara Lindemann & Paul Grossman, Employment Discrimination Law 656-57 (3d ed. 1996) ("The rationale is that appropriate opposition should not be chilled by fear of retaliation — even if, as a matter of fact or law, there is no violation.") (footnote omitted).

Defendant argues plaintiff failed to engage in statutorily protected activity and, thereby, failed to satisfy the first element of her prima facie case. Under the opposition clause, plaintiff's lack of filing a formal charge of discrimination will not defeat her retaliation claim.

Plaintiff, however, must have made the University aware that she was complaining about gender-based wage discrimination. See Equal Employment Opportunity Commission v. White and Son Enterprises, 881 F.2d 1006 (11th Cir. 1989). She failed to do this. Plaintiff admits she never mentioned gender in her

28

discussions with Mr. Lanier, Dr. Montgomery, or Dr. Vickers.  She

never communicated to Dr. Montgomery or Dr. Vickers that she

believed Mr. Sims' receipt of Title III funds was an act of gender

discrimination.  In fact, plaintiff characterized her meetings as

an "attempt to rectify the situation" of Mr. Sims receiving a

portion of her salary.  Plaintiff testified:

> Q.    Do you have any specific recollection or any
>        documentation that you ever made any complaint to
>        Dr. Vickers or anybody else that the reason for any
>        difference in your salary had to do with your
>        gender?
>
> A.     I would say that it was implied in the
>        conversations and meetings.
>
> Q.    Would it be implied in the way that you have
>        described before about, you know, this guy is a
>        male and he got part of my salary?  Is that what
>        you're talking about?
>
> A.     No. What I'm saying is that at the time of these
>        meetings, I had not filed a lawsuit.  I was trying
>        to resolve my situation with people that I believe
>        that were really trying to resolve it.
>
> Q.    My question is this: You said it was implied.  How
>        was it implied in any meeting that you had that
>        anything that had happened relative to your salary
>        was because of your gender?  How was that implied?
>
> A.     As I stated earlier, that conversations were we are
>        going to put this male on University funds.  This
>        male, this individual, this male will not be
>        receiving part of your salary as soon as we can
>        correct this.

(Plaintiff's Deposition at 83-84.)

29

As stated above, a claim under the opposition clause must not only be subjectively reasonable, but also objectively reasonable. There is no doubt that plaintiff subjectively possessed a good faith belief that she was being discriminated against because of her gender. Plaintiff, however, fails to present evidence that this belief was objectively reasonable. "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999) (citing *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998)). Plaintiff fails to present any evidence that her belief was objectively reasonable. Mr. Sims' receipt of Title III funds and plaintiff's receipt of a lower salary that other Title III counselors based upon the salary schedule classifications does not make her belief objectively reasonable. None of the conduct described comes anywhere near constituting wage discrimination, regardless of the relative positions of the employees involved.

Plaintiff fails to establish the first element of her prima facie case of retaliation. It is therefore unnecessary for this court to proceed with the remaining *McDonnell Douglas* framework of analysis. Defendant's motion for summary judgment is due to be granted.

30

## IV. CONCLUSION

For the foregoing reasons, this court concludes that defendant's motion for summary judgment is due to be granted. Defendant's motion to strike is due to be denied. An appropriate order consistent with this memorandum opinion will be issued contemporaneously herewith.

**DONE** this 19th day of August, 1999.

_____
United States District Judge

31